UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| TANYA MYERS, <br><br> Plaintiff, <br><br> v. <br><br> P.O. BERNARDINO, P.O. ASHCRAFT, Individually, and the TOWN OF MUNSTER, <br><br> Defendants. | 2:15-cv-00399-PPS |

## OPINION AND ORDER

In 2013, Plaintiff Tanya Myers was involved in the slow and hostile disintegration of her marriage to John Myers. For the sake of clarity and convenience, and without intending any disrespect, I will use Mr. and Mrs. Myers' first names in this opinion. According to Tanya, John presented incomplete and one-sided information to obtain an order of protection against her, then provided false information to the police to bring about Tanya's arrest. She now seeks redress from the officer who arrested her and the Town of Munster, which employs the officer. But because the arresting officer reasonably acted on the basis of a facially valid arrest warrant when he arrested Tanya, she cannot prevail in her § 1983 suit for violation of her rights under the Constitution.

**Background**

The facts set forth below are told in the light most favorable to Tanya. According to Tanya, in August 2013 John went to a judge *ex parte* and provided a series of lies and half-truths, and as a result, came away with an order of protection against Tanya. The protection order prohibited Tanya from contacting John or John's daughter. Tanya received official mailed notice of the protection order around August 20, 2013. Tanya did not contact John or his daughter after receiving notice of the order. (DE 48-1 at 6, 9, 10, 11, 25.) The day after getting the notice, Tanya requested a hearing before the judge. (DE 48-1 at 9, 10.) The hearing was scheduled for September 12, 2013, and both Tanya and John attended. At the hearing, Tanya saw John's petition for the protection order for the first time. She then told the judge her side of the story, and the judge vacated the protection order, but told both parties to avoid each other. (DE 48-1 at 11-12; DE 48-2 (Order Dismissing Petition and/or an Order for Protection dated Sept. 12, 2013).) According to Tanya, she did not contact John or his daughter after the hearing, nor did she ask anyone else to do so on her behalf. (DE 48-1 at 12.)

A couple weeks later, on October 5, 2013, Munster Police Officer Bernardino was dispatched to John's home in response to a call made by John. (DE 48-4 at 5.) John showed Officer Bernardino e-mails on his mobile phone and a call log that purported to show that Tanya had contacted John and his daughter in violation of a protection order. (DE 48-4 at 5-6.) Tanya testified that John had changed his online login information in early 2013, after Tanya told him she was filing for divorce, and it was these accounts

2

from which John claimed that Tanya was sending him e-mails. (DE 48-1 at 10, 15; DE 48-4 at 6-7.) Tanya contends that all of this evidence of her contacting them was fabricated. John eventually sent Officer Bernardino records of purported communications that he had received from Tanya during August, September, and October of 2013, although not the same messages Officer Bernardino remembered seeing when he responded to John's call on October 5th. (DE 48-1 at 14; DE 48-4 at 7, 13, 14, 15.) Officer Bernardino consulted a police database and confirmed that the protection order John had shown him was listed as still being active. (DE 48-4 at 10-11.)

Based on the active protection order, the phone log purporting to show that Tanya called John's daughter, and the messages that Tanya allegedly sent to John, Officer Bernardino referred the case to the Lake County prosecutor for possible prosecution and completed a probable cause affidavit. (DE 48-4 at 15; DE 41-1 at 12, 18.) The Lake County prosecutor decided to prosecute, and Tanya was charged with invasion of privacy under Indiana Code § 35-46-1-15.1(1). The form Information dated October 10, 2013, alleged that Tanya "violate[d] a Protective Order . . . requiring [her] to refrain from abusing, harassing or disturbing [t]he peace of" John or his daughter. (DE 41-1 at 19.) An arrest warrant was thereafter issued in connection with the charge. (DE 41-1 at 20.) According to Tanya, she learned of the arrest warrant on October 25, 2013, when she received a copy of it in the mail, and she immediately called the Munster Police Department to inquire. She testified that she spoke with a woman who told her to come to the police station and bring a copy of the vacated protection order, which she

3

did shortly before 5:00 p.m. that same Friday. (DE 48-1 at 16-17, 21.) Upon arrival at the police station she met with Officer Ashcraft. According to his report, Officer Ashcraft met with Tanya at 5:41 p.m. that day. (DE 48-3 at 17.)

Officer Ashcraft testified during his deposition that when he spoke to Tanya in the police station, he asked for her identification card, which he brought to the police dispatcher to run through the police system. That search indicated that there was an active warrant for her arrest. The dispatcher then called and confirmed the active warrant with the originating party, Lake County, Indiana. (DE 48-3 at 7.) Officer Ashcraft did not independently check for a warrant himself. (DE 48-3 at 8.) His report indicates that at some point he learned that the warrant was for invasion of privacy, but he did not recall whether he knew that when he arrested Tanya, or whether he learned it later, but before writing the report. (DE 48-3 at 11, 12; DE 41-1 at 28.) Officer Ashcraft testified that, upon learning of the confirmed active warrant from the dispatcher, he arrested Tanya. He testified that he did not recall whether Tanya showed him a vacated protection order before he arrested her. (DE 48-3 at 7.) When shown a copy of the document vacating the protection order, Officer Ashcraft testified that he had not previously seen the document. (DE 48-3 at 15.)

Tanya's version of her arrest varies a bit from Officer Ashcraft's, and because Tanya is opposing summary judgment, I draw reasonable inferences in her favor. *See, e.g., Belcher v. Norton*, 497 F.3d 742, 747 (7th Cir. 2007). The recollections to which Tanya testified are more detailed than Officer Ashcraft's—unsurprising, given that her arrest

4

was a unique experience for her, and a commonplace one for Officer Ashcraft. Tanya says that she showed Officer Ashcraft the vacated protection order, and as he read it "he flushed a little bit red," but then told her that he still had to arrest her. (DE 48-1 at 18.) Tanya testified that she asked what he had to arrest her for, and he said for violation of privacy. (DE 48-1 at 18.) Tanya says that Officer Ashcraft told her that he would speak to someone at Lake County about the apparent mistake, but that didn't happen; instead, he just left Tanya at Lake County lockup. (DE 48-1 at 19-20.) A female officer who processed her at Lake County did look up the protection order and, according to Tanya, said to another officer, "[s]he's right. The order was vacated. There is no way this warrant should've even been issued." (DE 48-1 at 20.) Nonetheless, the officer told Tanya that she had to bail out or wait for the judge to return on Monday morning. (DE 48-1 at 20-21.)

Tanya spent several unpleasant hours in a holding cell with several other people, one of whom was "acting crazy," under strong air conditioning that Tanya alleges aggravated her arthritis. (DE 48-1 at 21, 23-25.) Around 4:00 a.m. Tanya finally remembered her youngest son's phone number and called him to come bail her out. (DE 48-1 at 21.) She estimated that, after processing, she left the Lake County jail a little after 6:00 a.m. (DE 48-1 at 22.)

Officer Ashcraft testified that, vacated protection order or no, once he learned that there was an active warrant for Tanya's arrest confirmed by Lake County, he was going to arrest her. (DE 48-3 at 16-18.) He testified that it is for the court to determine

5

whether there was a valid basis for an arrest warrant. (DE 48-3 at 17.) On the other hand, it is his job, as a patrolman, to execute a "shall arrest" warrant that appears valid. (DE 48-3 at 17-19.)

Officer Ashcraft further testified that John contacted the Munster Police at the end of November 2013, after Tanya's arrest. At that point, John reported to Officer Ashcraft that Tanya was still trying to contact him. Afterwards, Officer Ashcraft checked his computer system and found that the protection order against Tanya in favor of John still appeared to be active, so Officer Ashcraft called Tanya to tell her to stop trying to contact John. (DE 48-3 at 13.) In fact, according to Tanya's testimony, in November, after her arrest, she and John went back before the family court judge who *sua sponte* issued a protection order against John in favor of Tanya. (DE 48-1 at 6, 12-13.) In discussing the fact that the computer system showed an active order of protection apparently several weeks after it was vacated, Officer Ashcraft testified that it is not his place to ensure that the records of protection orders are updated, but rather the job of "somebody down at Lake County." (DE 48-3 at 14.)

Tanya was never actually prosecuted. The Lake County Prosecutor's Office filed a motion to dismiss the criminal case against her on January 13, 2014, citing insufficient evidence to successfully prosecute the case. (DE 48-5 at 2.)

**Discussion**

It is proper to grant summary judgment when there exist no outstanding issues of material fact that require determination through trial. In such a situation, the moving

6

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see, e.g.*, *Belcher v. Norton*, 497 F.3d 742, 747 (7th Cir. 2007). I will construe all reasonable inferences in favor of the non-moving party, here Plaintiff Tanya Myers, and the defendants must meet the initial burden of showing there is no genuine issue of material fact. *Belcher*, 497 F.3d at 747 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)). However, if the defendants do that, the non-moving party then bears the burden of presenting specific facts demonstrating a genuine need for trial. A "mere scintilla" of evidence will not suffice; I won't ignore genuine issues of material fact, nor will I strain to find such issues where there are none. *Belcher*, 497 F.3d at 747 (citing, *et seq.*, *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)).

At the outset I note that Tanya's response to the defendants' motion for summary judgment states that she has decided to drop her claim for false arrest against Officer Bernardino, who initially responded to John's police call, and who reported the case to the Lake County Prosecutor's Office. I interpret this as a request to voluntarily dismiss the claim against Officer Bernardino under Federal Rule of Civil Procedure 41(a)(2), which I now grant. The claim against Officer Bernardino is therefore dismissed without further discussion.

Before reaching the substance of the case, I will also briefly address Tanya's request for oral argument. She based the request on her belief that Defendants' brief did not adequately address the legal issues, and on the fact that this Court has not considered this exact issue before. (DE 47.) Whether to hold oral argument is a matter

entrusted to the district court's discretion. N.D. Ind. L.R. 7-5. Based on the parties' briefing and my review of controlling precedent, oral argument is not necessary. Accordingly, Plaintiff's Motion Requesting Oral Argument for Defendant's Motion for Summary Judgment Pursuant to Local Rule 7-5, is denied.

The amended complaint alleges two counts: (1) a count of false arrest against Officers Bernardino and Ashcraft under 42 U.S.C. §§ 1983 and 1988 for violation of Tanya's rights based on the Fourth and Fourteenth Amendments to the Constitution, as well as (2) a count for "Indemnification" against the Town of Munster based on the allegation that "pursuant to Indiana Law and contract obligations with it's [*sic*] employees, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities." (DE 21.) Tanya leaves the exact mechanics of her claim to be inferred, but to state it explicitly, she alleges that she should not have been arrested, and that her arrest was a violation of the Fourth Amendment's protection against unreasonable seizure of her person, made applicable to the states by the Fourteenth Amendment. Under 42 U.S.C. § 1983, a plaintiff can sue a defendant who "acts under color of state law and violates a plaintiff's rights under the Constitution or laws of the United States." *Pittman v. County of Madison*, 746 F.3d 766, 775 (7th Cir. 2014).

Tanya's "Statement of Genuine Disputes" lists facts that the parties may indeed dispute (DE 48 at 4-7), but none of them are material to the questions upon which the outcome of this case turn. The Fourth Amendment to the Constitution protects Tanya

from unreasonable seizure, not from all arrests. *See Belcher*, 497 F.3d at 748; *see also Baker v. McCollan*, 443 U.S. 137, 145 (1979). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application[,] . . . [it] requires careful attention to the facts and circumstances of each particular case." *Belcher*, 497 F.3d at 748 (quotation marks omitted) (quoting *Donovan v. City of Milwaukee*, 17 F.3d 944, 949 (7th Cir. 1994)).

Unsurprisingly, and unfortunately, Tanya is not the first person to sue for false arrest based on a warrant-related mistake. The Seventh Circuit has directed district courts with respect to the proper inquiry in such situations:

> The fact that [Plaintiff] was arrested pursuant to a facially valid arrest warrant narrows the circumstances under which she could prevail on her false arrest claim. As we stated in *Juriss v. McGowan*:
>> Generally, a person arrested pursuant to a facially valid warrant cannot prevail in a § 1983 suit for false arrest; this is so even if the arrest warrant is later determined to have an inadequate factual foundation. [] There was (and still is), however, a recognized exception for situations where officers responsible for bringing about an unlawful arrest knew that the arrest warrant had issued without probable cause; this is particularly true of officers who knew that those who obtained the warrant had deceived the authorizing body. [] Under these circumstances, even a facially valid arrest warrant does not shield otherwise unreasonable conduct.
>
> [] Thus, in order to prevail on her false arrest claim, [Plaintiff] ultimately would have to show not only that there was no probable cause to believe she had committed a crime,

9

> but also that [the arresting officers] knew that the arrest
> warrant was issued without probable cause.

*Williamson v. Curran*, 714 F.3d 432, 443-44 (7th Cir. 2013) (internal citations omitted) (quoting *Juriss v. McGowan*, 957 F.2d 345, 350-51 (7th Cir. 1992) (citing *Malley v. Briggs*, 475 U.S. 335, 345 (1986); *Baker v. McCollan*, 443 U.S. 137, 143 (1979); *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985); *Mark v. Furay*, 769 F.2d 1266, 1268 (7th Cir. 1985)); citing *Betker v. Gomez*, 692 F.3d 854, 864 (7th Cir. 2012); *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 742-43 (7th Cir. 2003); *Neiman v. Keane*, 232 F.3d 577, 579–80 (7th Cir. 2000)); *see also Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 483 n.5 (7th Cir. 2011) (stating the facially valid warrant rule but deciding appeal on other ground).

The Seventh Circuit has addressed different scenarios of mistaken arrests based on facially valid warrants, finding that, so long as the arresting officer acted in good faith based on a facially valid warrant, the officer is not liable. *See, e.g.*, *White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995) (arrest of incorrect person sharing the name listed in arrest warrant "will not violate the Fourth Amendment unless the arresting officer acted unreasonably"); *Johnson v. Miller*, 680 F.2d 39, 40-41 (7th Cir. 1982) (defrauded bank sought criminal charges against identity theft victim whose name had been used by fraudster, warrant listed victim's name but physical description of fraudster, officer who arrested victim despite her not matching physical description was not liable in § 1983 Fourth Amendment suit because he executed arrest warrant against person named in warrant).

The rule applies here: Tanya cannot prevail in her § 1983 suit for false arrest because she was arrested based on a facially valid warrant. The warrant was confirmed through the computer system and by calling Lake County, the originating entity. It is irrelevant whether the warrant had an inadequate factual foundation, which is the question to which most of Tanya's listed disputed facts pertain.

An exception to this rule would apply if Officer Ashcraft, who arrested Tanya, knew the arrest warrant had issued without probable cause. But there is no suggestion that Officer Ashcraft knew anything about the Myers domestic matter before he was dispatched in response to Tanya showing up at the police station on October 25, 2013. He just happened to be the one who was on duty and responded to the call. The thing that matters is what Officer Ashcraft knew at the time, *see, e.g.*, *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994); he won't be penalized based on 20/20 hindsight.

It is true that Tanya tried to explain the situation and showed Officer Ashcraft that a protection order had been vacated. But nothing in the documents she brought specifically referred to the charging document or the warrant for her arrest. The warrant was for invasion of privacy under Indiana Code § 35-46-1-15.1(1). It is entirely plausible that a warrant was outstanding for invasion of privacy even if a protection order had been vacated. Perhaps the violation that led to the warrant occurred before the protection order was vacated. What's more, it is not difficult to imagine a family law situation in which one protection order has been vacated, but some related violation has led to a new, valid basis for charges and arrest. Nor is it unusual for the subjects of

11

arrest warrants to protest the validity of the charges. *See, e.g.*, *White v. Olig*, 56 F.3d 817, 820 (1995). Perhaps Officer Ashcraft could have done more, but he did not have after-hours access to the prosecutors or judges who may have been able to clear up the situation, and precedent dictates that he is not legally obligated to do so. *Williamson*, 714 F.3d at 447; *see also Baker v. McCollan*, 443 U.S. 137, 145-46 (1979).

Tanya asserts that Officer Ashcraft had a duty to investigate her claims that the warrant was a mistake before arresting her. (DE 48 at 13-14.) She is mistaken, and the cases she cites are either distinguishable from this case or support the grant of summary judgment. *See Hebron*, 18 F.3d 421 (police investigating allegations to determine whether there was probable cause to arrest received questionable information so had duty to investigate further); *Lowrance v. Pflueger*, 878 F.2d 1014 (7th Cir. 1989) (the Court noted that arresting officers had the same information as officer who obtained warrant, which was sufficient, and further noted "that a warrant had issued for the [plaintiff's] arrest, from which they could infer that a neutral, detached judicial officer had reviewed the information and found probable cause") (citing *Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ("[P]olice officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause.") (dicta)); *BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986) (police officer conducting investigation and arrest did not have probable cause to arrest plaintiffs and should have investigated further). *Hebron* and *BeVier* involved arrests made by officers conducting

their own investigations, not officers acting on arrest warrants. *Lowrance* did not hold that the arresting officers needed to conduct their own investigation—they reasonably relied on information supplied by the originating sheriff's department with respect to the basis of the arrest, and on an arrest warrant issued by a judicial officer.

Officer Ashcraft's testimony is clear that he considered it his duty to arrest Tanya once it was confirmed that she was the person referred to in an active arrest warrant. That is what most police officers would likely have done; it was certainly reasonable.

It is also certain that Tanya got the short end of the stick in this whole saga. Taking her account as true, John told half-truths to obtain a protective order, then repeatedly falsified evidence that Tanya violated that order, even after he knew the order was vacated. Tanya did everything right: she went to court to get the protection order vacated, she turned herself in when she learned there was a warrant for her arrest, and she comported herself with admirable composure as she was arrested. But as harsh as it might be, the Constitution does not protect all innocent people from arrest. Luckily, justice seems to eventually have been done; the protection order was quickly vacated, and the criminal charges against Tanya were dismissed. Legally actionable misdeeds may have been committed here — if one believes Tanya, certainly by John! — but Officer Ashcraft's arrest of Tanya wasn't one of them under the Constitution, and that's the only claim before me.

Still, the entities involved would be well advised to look into improving a system that results in a protection order showing as valid long after it has been vacated, which

in turn results in charges and an arrest warrant for fabricated or legal activity. What happened to Tanya here could happen to any law-abiding citizen, and the outcome of this case does not mean that should be condoned, as the Seventh Circuit held in a case of arrest based on mistaken identity:

> [W]e caution that our ruling does not mean that we condone the treatment that [Plaintiff] received or believe that police officers should be able to make such mistakes with impunity. Any law abiding citizen would rightfully be disturbed to learn that he or she could be mistakenly arrested and held in jail . . . before the mistake was discovered. While the events here do not give rise to an action under Section 1983, they may well be actionable under state law. In any event, every effort should be made to insure that they are not repeated.

*White v. Olig*, 56 F.3d 817, 821 (1995). While anyone would sympathize with Tanya, Officer Ashcraft is not liable under § 1983 based on her arrest.

Furthermore, although the complaint is not entirely clear about the basis of Tanya's claim against the Town of Munster, her use of the term "indemnification" indicates that the claim is derivative of her direct claim against Officer Ashcraft. But even if the claim against Munster is meant to be an independent claim against the town based on *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978), it would still necessarily depend upon Officer Ashcraft being held liable in the first instance. *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010) ("[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee.") Having found that no claim can proceed to trial against Officer Ashcraft, summary judgment is likewise granted in favor of the Town of Munster.

## CONCLUSION

Therefore, for the foregoing reasons, I (1) **DENY** Plaintiff Tanya Myers's request for oral argument (DE 47), (2) **GRANT** Plaintiff Tanya Myers's request to dismiss the claim against Officer Bernardino, and the claim against Officer Bernardino is **DISMISSED** (DE 48), (3) **GRANT** Defendant Officer Ashcraft's motion for summary judgment on the false arrest claim pending against him (DE 41), and (4) **GRANT** Defendant Town of Munster's motion for summary judgment on the claim for "indemnification" (DE 41). The clerk shall **ENTER FINAL JUDGMENT** in favor of Defendants.

    **SO ORDERED**.

    ENTERED: December 14, 2016

    /s/ Philip P. Simon
    **PHILIP P. SIMON, CHIEF JUDGE**
    **UNITED STATES DISTRICT COURT**